Filed 6/7/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| J.J., | |
|     Petitioner, | |
| v. | A162060 |
| THE SUPERIOR COURT OF THE COUNTY OF CONTRA COSTA, | |
|     Respondent, | (Contra Costa County Super. Ct. No. J1900651) |
| THE PEOPLE, | |
|     Real Party in Interest. | |

Does Welfare and Institutions Code section 709, which describes incompetency proceedings for minors who are subject to delinquency petitions in juvenile court, allow the secure confinement of those minors beyond the statutory period for remediation of their competency?[1]

---

[1] Unless indicated otherwise, all statutory references are to the Welfare and Institutions Code.

1

Petitioner J.J. was alleged to have committed offenses within the meaning of section 707, subdivision (b).  The juvenile court declared him incompetent to stand trial, suspended the delinquency proceedings against him, and ordered remediation services for J.J. in juvenile hall (§ 709).  After six months, the court extended remediation and J.J.'s confinement to 12 months, at which point the court found that J.J. still had not attained competency.  Although the maximum period for remediation under section 709 is stated to be 12 months, the court ordered his continued confinement pending finalization of an exit order and post-release services to assist his reentry into the community, finding the confinement necessary and in the best interests of the minor and public safety.  (See § 709, subd. (h)(5)(C) [allowing confinement of certain juveniles for up to 18 months where "necessary and in the best interests of the minor and the public's safety"].)

We agree with J.J. that the juvenile court lacked authority to order his continued confinement under section 709, subdivision (h)(5)(C).  Once the court determined that J.J. had not attained competency at the end of the statutory remediation period, no further confinement could be ordered given the state of the record in J.J.'s case, and the court was required to dismiss the delinquency petition and release J.J. (in the absence of civil commitment proceedings).  Furthermore, the purpose of section 709 is to protect a minor from juvenile proceedings during incompetency and to provide remediation services with a goal of restoring the minor to competence.  Section 709, subdivision (h)(5) does not permit the involuntary confinement of a minor beyond the statutory remediation period for the purpose of arranging post-release services that are not designed to restore competency.

## I. FACTS AND PROCEDURAL HISTORY

In July 2019, the Contra Costa County District Attorney filed a delinquency petition pursuant to section 602, alleging that J.J. had committed nine felony counts of forcible lewd conduct with a minor (Pen. Code, § 288, subd. (b)(1)). The next day, J.J. was detained in juvenile hall.

In August 2019, J.J.'s counsel expressed a doubt as to his competency and the court suspended the delinquency proceedings pursuant to section 709. At a contested competency hearing on November 20, 2019, Dr. Karen Franklin opined that J.J. was incompetent to stand trial. The court found him incompetent, continued his detention, and referred him to competency remediation services in juvenile hall.

After J.J. had been confined for six months, the court held an evidentiary hearing on June 2, 2020, to determine whether J.J. was remediated and his competency restored. (§ 709, subd. (h)(1).) The court found that he remained incompetent but extended the remediation period for six months based on a further finding that J.J. could likely be remediated within that time. (§ 709, subd. (h)(3).) J.J. remained in juvenile hall.

In September 2020, Dr. Franklin submitted a report of her reevaluation of J.J.'s competence, opining that he remained incompetent to stand trial. Diagnosed with Mild Intellectual Disability, J.J. was in the eleventh grade but read at a second-grade level, his IQ score was lower than 99.6 percent of children his age, his learning ability score was worse than 99.9 percent, and his capacity to focus attention was poorer than 93 percent. Although provided competency training, J.J. had difficulty in the program and still did not understand pleas and could not articulate a defense. Dr. Franklin opined that "[m]ost prominently impaired were [J.J.'s] capacities to meaningfully consult with counsel and assist in preparing his defense," as he lacked

3

capacity to rationally weigh and evaluate his options, seek out relevant information, retain essential information, articulate rational support for decisions, "[e]ngage meaningfully in this defense," "participate in planning strategy," "[c]hallenge witnesses," or "testify relevantly." Moreover, his "capacity to consult meaningfully with counsel and assist in the preparation of his defense remain essentially unchanged" since the last competency examination. In fact, his comprehension of very basic information degraded over time, so "even if his attorneys work intensively with him to break down case issues so that he can understand them, any comprehension he attains may be fleeting." Dr. Franklin did not indicate that J.J.'s competency might be restored with further remediation services.

On December 15 and 31, 2020, roughly one year after the initial finding of incompetence, the court held another contested competency hearing.[2] Dr. Franklin's opinion was submitted to the court; the prosecutor presented a witness who testified that J.J. was nonetheless competent to stand trial, based largely on a mock trial. In addition to issues of J.J.'s competency, the court and parties discussed whether juveniles who (like J.J.) were alleged to have perpetrated offenses under section 707, subdivision (b), could be confined beyond the statutory remediation period pursuant to section 709, subdivision (h)(5)(C). The core debate—echoed in this appeal—centered around this: while subdivision (h)(3) of section 709 caps the remediation period at 12 months after the initial finding of incompetency, subdivision (h)(5) allows for secure confinement up to *18* months for juveniles alleged to

---

[2]     The parties stipulated at a hearing on November 13, 2020, that the deadline for competency remediation under section 709, subdivision (h)(3) was tolled for one month, given Emergency Rule 7(e) and the fact that J.J. had not received remediation services for a month due to the COVID-19 pandemic. On December 15, 2020, the court ruled that the period was tolled due to the unavailability of remediation services, not Emergency Rule 7(e).

4

have committed section 707, subdivision (b) offenses, upon a finding that such confinement would be in the best interests of the minor and the public's safety.

On December 31, 2020, the juvenile court issued a minute order stating as follows: "The Court finds minor has not attained competency. The Court finds, pursuant to WIC 709(h)(5)(C) that it is necessary and in the best interests of the minor and the public safety for the minor to *remain in secure confinement in juvenile hall pending the development of an exit plan and services for the minor to assure he has appropriate support upon his release* from custody. Probation shall prepare a report for next hearing with an exit plan for minor upon dismissal of petition and release of minor so that he can be released to [the] community with all supportive therapeutic and housing services in place. . . . Probation shall consult with and work with father in connection with the plan and his needs to assist the minor in successfully and safely transitioning back into the community." (Italics added.)

On January 12, 2021, the court continued J.J.'s detention in juvenile hall until February 23, 2021, pending the finalization of out-of-custody transition services. Through counsel, J.J. asked the court to be released because his continued confinement violated his due process and equal protection rights. The court declined, explaining that it was in J.J.'s "best interest, not just all of ours, [J.J.] needs these services, [J.J.]'s best interest, and the safety of the community, to keep him in the juvenile hall." The court based its conclusion on the severity of the delinquency allegations and the level of services J.J. had received.

On February 3, 2021, J.J. filed a motion in the juvenile court for his immediate release and dismissal. At a hearing on February 9, 2021, the prosecutor insisted that section 709, subdivision (h)(5)(C) allowed

confinement of a juvenile charged with offenses under section 707, subdivision (b) for 18 months, and the period between the 12-month cutoff for remediation (subdivision (h)(3)) and the 18-month cutoff for confinement (subdivision (h)(5)(C)) could be used for "getting services in place" for the juvenile and to "bridge the gap" between confinement on the section 602 petition and filing a civil commitment. J.J.'s counsel countered that J.J.'s release was required because, *inter alia*, the remediation period had ended without J.J. regaining competence.

At the conclusion of the February 9, 2021 hearing, the juvenile court denied J.J.'s motion. The court ordered him to remain in juvenile hall until February 23, 2021, pursuant to section 709, subdivision (h)(5)(C), while services were set up for his return to the community.

J.J. sought writ relief in this court, seeking reversal of the juvenile court's order of February 9, 2021, and an order requiring his release and the dismissal of the charges against him.[3] We obtained briefing from the parties, who each propose conflicting interpretations of the relevant statutes, yet agree that the juvenile court's statutory construction was problematic and that writ relief should be granted.

---

[3]    The present petition is a follow-up to an initial writ petition J.J. filed on February 1, 2021, which we denied because J.J. had not (1) provided an adequate record to enable informed review (*Upshaw v. Superior Court* (2018) 22 Cal.App.5th 489, 497, fn. 4 ["[I]t is a writ petitioner's burden to present a procedurally and substantively adequate writ petition. . . ."]; *Sherwood v. Superior Court* (1979) 24 Cal.3d 183, 186–187; Cal. Rules of Court, rule 8.486(b)(1)), or (2) demonstrated that he initially exhausted other adequate remedies at law in the juvenile court by way of a noticed motion, to commence a process by which his contentions could be meaningfully and thoroughly vetted in that court in the first instance. This refiled petition cured the record deficiencies, and followed motion proceedings in the juvenile court.

We decided writ review should be granted to resolve these questions of first impression of importance to the juvenile bench and bar, which bear not only on J.J.'s claim of unlawful confinement but also future cases involving the detention of incompetent youth beyond the one-year statutory remediation period. (*Hogya v. Superior Court* (1977) 75 Cal.App.3d 122, 129–130; see also *Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266, 1273–1274.) "[G]iven that the petition raised a question of first impression appropriate for resolution in a published opinion, we deliberately chose to issue an OSC [order to show cause] instead of an alternative writ, since the latter procedure would have permitted reversal of the challenged order with the undesirable result of potentially rendering the issue moot." (*Paul Blanco's Good Car Company Auto Group v. Superior Court* (2020) 56 Cal.App.5th 86, 99.) Cognizant of the inherent urgency of the situation and J.J.'s claim of irreparable harm, we expedited further briefing and our review of this matter.

Meanwhile, on February 23, 2021—nearly two months after the juvenile court found that J.J. had not regained competency under section 709 – the district attorney filed a petition to commit J.J. pursuant to section 6500.[4] J.J. filed a demurrer to the commitment petition. On March 9, 2021, the court overruled the demurrer and ordered J.J. detained pursuant to the section 6500 petition. The court granted J.J.'s motion to dismiss the section 602 delinquency petition.

On March 12, 2021, the district attorney filed a motion to reconsider the dismissal of the delinquency petition so the juvenile records would remain unsealed for the civil commitment proceedings. The court reinstated

---

[4] Under section 6500, subdivision (b), a person with a developmental disability may be committed to the Department of Developmental Services for treatment and residential placement if found to be a danger to self or others.

7

the delinquency petition on March 19, 2021 and set a jury trial on the civil commitment petition for April 19, 2021. The trial was thereafter vacated pursuant to a negotiated disposition; J.J. was released upon agreeing to outpatient services, and the civil commitment petition may be dismissed if J.J. makes good faith efforts to participate in those services. The delinquency petition has again been dismissed.

Given that the delinquency petition has been dismissed, and J.J. is no longer confined pursuant to section 709, subdivision (h)(5)(C) and the February 9, 2021 order, J.J.'s challenge to that order is moot. We nonetheless exercise our discretion to decide the petition on the merits. (E.g., *Last Frontier Healthcare Dist. v. Superior Court* (2019) 33 Cal.App.5th 492, 495, fn. 3.) The issues raised by the petition present questions of first impression and could arise in other cases. (*People v. Armogeda* (2015) 233 Cal.App.4th 428, 433 ["An appellate court has discretion to decide a moot claim that presents questions of general public concern, 'particularly in the area of the supervision of the administration of criminal justice.' "].)

## II. DISCUSSION

J.J. contends the continuation of his secure confinement pending arrangement of post-release services, after the court had found that he had not attained competence by the end of the 12-month statutory remediation period, violated section 709 and his constitutional rights. We begin with a closer look at section 709.

### A. Section 709

If the juvenile court has a doubt that a minor who is subject to any juvenile proceeding is competent—meaning the minor lacks sufficient present ability to assist in his or her defense or lacks a rational and factual

8

understanding of the nature of the charges—the court must suspend the juvenile proceedings.  (§ 709, subd. (a)(1) & (2).)

Unless the parties stipulate that the minor lacks competency, the court must appoint an expert to determine whether the minor suffers from a mental illness, mental disorder, or other condition affecting competency and whether the minor is incompetent.  (§ 709, subd. (b)(1) & (2).)

An evidentiary hearing on the minor's competency is then held as set forth in section 709, subdivision (c).  The minor is presumed competent "unless it is proven by a preponderance of the evidence that the minor is mentally incompetent."  (§ 709, subd. (c).)

If, at this initial competency hearing, the court finds that the minor is competent, "the court shall reinstate [the juvenile] proceedings and proceed commensurate with the court's jurisdiction."  (§ 709, subd. (d).)  If, on the other hand, the court finds the minor incompetent, "all proceedings shall remain suspended for a period of time that is no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future, or the court no longer retains jurisdiction and the case must be dismissed."  (§ 709, subd. (e).)  If the petition alleges only misdemeanors, the petition is dismissed.  (§ 709, subd. (f).)

When the minor is found to be incompetent, the court must "refer the minor to services designed to help the minor attain competency, unless the court finds that competency cannot be achieved within the foreseeable future."  (§ 709, subd. (g)(1).)  In addition, the court may "refer the minor to treatment services to assist in remediation that may include, but are not limited to, mental health services, treatment for trauma, medically supervised medication, behavioral counseling, curriculum-based legal

9

education, or training in socialization skills, consistent with any laws requiring consent." (§ 709, subd. (g)(1).) "Services shall be provided in the least restrictive environment consistent with public safety," and a "finding of incompetency alone shall not be the basis for secure confinement." (§ 709, subd. (g)(1).) The court must review remediation services at least every 30 days for minors in custody. (§ 709, subd. (g)(1).)

Section 709 provides for a second competency hearing (six-month hearing). Subdivision (h)(1) of the statute provides: "Within six months of the initial receipt of a recommendation by the designated person or entity, the court shall hold an evidentiary hearing on whether the minor is remediated or is able to be remediated." (§ 709, subd. (h)(1).)

If, at the six-month hearing, the court finds the minor has been remediated (competent), the court must reinstate the juvenile delinquency proceedings. (§ 709, subd. (h)(2).) If the court finds that the minor has *not* been remediated and is *not* likely to achieve competency within six more months, the court must dismiss the petition and "may invite persons and agencies with information about the minor . . . to the dismissal hearing to discuss any services that may be available to the minor after jurisdiction is terminated" or refer the minor for possible civil commitment under section 5300 et seq. or section 6550 et seq. (§ 709, subd. (h)(4).)

"If the court finds that the minor has not yet been remediated, but *is* likely to be remediated within six months, the court shall order the minor to return to the remediation program." (§ 709, subd. (h)(3), italics added.) The "total remediation period," however, "shall *not exceed one year from the finding of incompetency*." (§ 709, subd. (h)(3), italics added.)

Section 709, subdivision (h)(3) also provides a cutoff for the "secure confinement" of the juvenile, stating that it "shall not exceed the limit

10

specified in subparagraph (A) of paragraph (5)." Subparagraph (A) of paragraph (h)(5) in turn provides that secure confinement "shall not extend beyond six months from the finding of incompetence" unless "the court determines . . . that it is in the best interests of the minor and the public's safety for the minor to remain in secure confinement" after considering where the minor will have the best chance of obtaining competence, whether the placement is the least restrictive for the minor, why alternatives to secure confinement are not available or appropriate, and whether the placement is necessary for the safety or the minor or others. (§ 709, subd. (h)(5)(A) & (B).) The statute does not state how far "beyond six months from the finding of incompetenc[y]" a juvenile can be held, except as set forth in section 709, subdivision (h)(5)(C), which provides: "Only in cases where the petition involves an offense listed in subdivision (b) of Section 707 may the court consider whether it is necessary and in the best interests of the minor and the public's safety to order secure confinement of a minor for *up to an additional year, not to exceed 18 months* from the finding of incompetence." (Italics added.) Section 707, subdivision (b) lists serious felonies including murder, arson, robbery, and rape.[5]

Accordingly, on the face of section 709, the *remediation period* can be extended to as many as *12* months after the initial finding of incompetency if the juvenile is reasonably likely to be remediated (§ 709, subd. (h)(3)), while 707(b) juveniles can be *securely confined* for up to *18* months from the finding of incompetency upon additional findings (§ 709, subd. (h)(5)(C)). If taken literally, the statute would allow the court to order a juvenile to 18 months of

---

[5] For brevity, we refer to juveniles who are alleged to have committed offenses under section 707, subdivision (b) as "707(b) juveniles." In addition, all references hereafter to statutory subdivisions are to subdivisions of section 709, unless otherwise indicated.

11

secure confinement, six months of which would be served beyond the remediation period.

The juvenile court and the parties in this case have advocated varying interpretations of this statutory language. The court—and the People at the time of the hearing at issue in this appeal—took the statutory language at face value, concluding that secure confinement is capped under subdivision (h)(5)(C) at 18 months and the remediation period is capped under subdivision (h)(3) at 12 months, and further concluding that the extra six months of confinement time can be used to fashion exit orders and post-release services. But J.J.—and the People on appeal—reject this construction on the ground that the juvenile's confinement for a non-remediation purpose is inconsistent with other provisions in the statute and gives rise to constitutional concerns. We discuss this matter *post*, as one of the main issues in this appeal.

Before we get to that issue, however, we consider another aspect of the statute. As mentioned, section 709 explicitly provides for an initial competency hearing (subd. (c)) and a six-month competency hearing (subd. (h)(1)). J.J. does not dispute the rulings at these hearings, challenging instead the court's February 2021 order issued after a *third* competency hearing in December 2020. Section 709 does not explicitly provide for a third competency hearing. As J.J. notes, however, common sense suggests there must be some sort of hearing approximately 12 months after the initial finding of incompetency, because without a determination of the juvenile's competence at the 12-month mark, there would be little purpose for extending the remediation period to that mark. The People do not disagree. We therefore assume that the December 2020 evidentiary hearing, roughly

12

12 months after the initial finding of incompetency, was consistent with section 709.

    B.  <u>Analysis</u>

    J.J. contends the order continuing his secure confinement beyond one year from the initial finding of incompetence (and thus beyond the remediation period) was erroneous for two reasons.  First, once the court determined in December 2020 that J.J. had not been remediated, as a matter of law J.J. had to be released and the delinquency petition had to be dismissed, so the court lacked authority to invoke subdivision (h)(5)(C) in February 2021 to extend his secure confinement.  Second, even if the court retained authority to extend confinement under subdivision (h)(5(C), that subdivision was not intended to extend a juvenile's confinement beyond the 12-month remediation period for the purpose of crafting exit orders and post-release services, but only to give the court time to finish its adjudication of the minor's competence.  J.J. therefore urges his continued confinement pursuant to section 709 was unlawful.

    The People reject J.J.'s argument that the court lost authority to extend his confinement under subdivision (h)(5)(C).  The People agree, however, that the court acted improperly, because while subdivision (h)(5)(C) authorized the court to extend the confinement time to 18 months, it could do so constitutionally only if the remediation period was also extended to 18 months.  In fact, the People argue, despite the statutory language, the 12-month remediation period is implicitly extended to 18 months when confinement is extended to 18 months, and the failure of the statute to say so is merely a matter of legislative oversight.  The People thus insist the February 9, 2021 order could be made right if we were to direct the juvenile court to order remediation services for J.J. during his confinement.

13

We therefore tackle two issues: (1) whether the court was obligated to dismiss the section 602 petition and release J.J. upon a finding that he had not regained competency by the end of the 12-month rehabilitation period; and (2) whether the period between the 12-month maximum rehabilitation period and the 18-month maximum confinement period could be used to confine him until the court found there were suitable post-release services.

1. Dismissal Upon J.J. Not Attaining Competence

Under subdivision (h)(4), if the juvenile court finds at the six-month hearing that the minor "will not achieve competency within six [more] months, the court *shall dismiss* the petition." (§ 709, subd. (h)(4), italics added.) The court may invite persons and agencies with information about the minor to attend "the dismissal hearing" to discuss services for the minor after jurisdiction is terminated and to refer the minor for evaluation under other code sections if appropriate. (§ 709, subd. (h)(4).) However, there is no provision in subdivision (h)(4) for continued remediation services, let alone continued confinement, if the court finds that the minor's competence will not be restored within six months after the six-month hearing.

Here, while the court did not make such a finding at the six-month hearing, it did find at the 12-month hearing that J.J. still had not attained competence, explaining that J.J. had no ability to communicate with counsel, understand decisions he had to make, make them, or assist in any meaningful way in his defense. At that point, J.J. claims, it was incumbent on the court to dismiss the proceedings and release him. (§ 709, subd. (h)(4).)

The People do not dispute that a dismissal and release would be required upon a finding that J.J. would not likely be restored to competence. But the People deny that such a finding was made here, because the court

14

"found only that petitioner had not regained competence, not that he was unable to regain competence."

Context, however, is everything. When the court found that J.J. had "not attained competency" at the 12-month hearing, the 12-month statutory remediation period was over. (§ 709, subd. (h)(3).) It is no surprise that the court did not explicitly find that J.J. was unlikely to regain competence in the future, since no such finding was required by the statute or requested by the parties. The court did not lament the unavailability of further services for competency restoration, but concerned itself with services to assist J.J.'s *release*. Further, the parties do not point us to evidence that J.J. *was* likely to attain competency. To the contrary, in requesting J.J.'s civil commitment, the People represented to the court that he was "not likely to be restored to competency in the foreseeable future."

Since a juvenile court must dismiss a juvenile proceeding at the six-month hearing if there is no likelihood the juvenile *will* be remediated by the end of the 12-month remediation period (§ 709, subd. (h)(4)), it makes sense that the court must dismiss the petition at the 12-month hearing where the juvenile *has not*, in fact, been remediated by the end of the 12-month remediation period. Accordingly, the finding that J.J. had not attained competence at the 12-month hearing required the court to dismiss the delinquency petition, thus ending the court's jurisdiction over J.J. and compelling his release from confinement.[6]

---

[6] We also note that J.J.'s failure to attain competency by the end of the 12-month remediation period might compel dismissal of the proceedings for another reason. If competency is not attained within "the reasonable period of time necessary to determine whether there is a substantial probability that [the juvenile] will attain [competency] in the foreseeable future," the juvenile's confinement must end for due process reasons (*Jackson v. Indiana* (1972) 406 U.S. 715, 738) and the juvenile proceedings can no longer be

15

We recognize that the People contend the 12-month statutory remediation period is implicitly extended to *18* months for 707(b) juveniles if certain findings are made under subdivision (h)(5)(C) to extend confinement to 18 months.  If the People's construction of section 709 were correct, the 12-month remediation cutoff stated in the statute would not bar further remediation services, and the court might not have to dismiss the proceedings if it made the requisite findings.  The People's argument is unavailing here, however.  First, the argument was not made to the juvenile court.  Second, when the court determined that J.J. had not regained competency in December 2020, the court had not *made* any findings under subdivision (h)(5)(C) that would have extended the confinement period to 18 months.  Third, the court did not find in December 2020 that there was any likelihood J.J. would be restored to competency so as to *justify* further remediation services.  No basis appeared for extending the remediation period.

Accordingly, upon finding that J.J. was not remediated at the December 2020 hearing, the juvenile court was obligated to dismiss the

---

suspended (§ 709, subd. (e)), which would result in the dismissal of those proceedings as well as the juvenile's release.  (See *In re Davis* (1973) 8 Cal.3d 798, 801 ["Unless such a showing of probable recovery is made within this period, defendant must either be released or recommitted under alternative commitment procedures."].)  If the Legislature in section 709 has permissibly *equated* the period reasonably necessary to determine the probability of the juvenile attaining competency (subd. (e)) with the 12-month remediation period (subd. (h)), dismissal of J.J.'s delinquency case was required as a matter of law.  If the period is instead a separate consideration that depends on the facts of each case, dismissal under subdivision (e) would require a factual finding that the court here did not make.  We need not resolve this question to resolve the appeal.

petition and release J.J., and it had no authority to extend his confinement under subdivision (h)(5)(C).[7]

## 2. No Confinement Without Purpose of Remediation

Even if the juvenile court was not compelled to release J.J. in December 2020 due to its finding that he had not attained competence, the court's extension of J.J.'s confinement under subdivision (h)(5)(C) would be erroneous if subdivision (h)(5)(C) cannot be used to extend confinement solely for the purpose of crafting exit orders and post-release services.

To resolve this question, we interpret subdivision (h)(5)(C) according to fundamental rules of statutory construction. The "first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386.) "In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." (*Id.* at pp. 1386–1387.) If the statute's language is ambiguous or susceptible of more than one reasonable interpretation, the court may turn to extrinsic aids to assist in

---

[7] Although not addressed by the parties, there is no indication that the dismissal compelled by section 709 can be *delayed* for the purpose of ordering post-release services while the minor remains confined. As mentioned, when the court finds that the juvenile will not likely regain competence within six months at the six-month hearing, it may invite informed persons and agencies to the dismissal hearing to discuss services that may be available after jurisdiction is terminated (§ 709, subd. (h)(4)), but this suggests a call for *readiness* at the dismissal hearing to discuss possible services, not a postponement of the dismissal to finalize those services while the juvenile languishes in confinement. Similarly, subdivision (e) provides that, "[p]rior to a dismissal, the court may make orders that it deems appropriate for services," but in context that refers to the court ordering *remediation* services until it must dismiss the case.

17

interpretation. (*In re. C.H.* (2011) 53 Cal.4th 94, 100–101.) "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered" in this regard. (*Dyna-Med, supra*, 43 Cal.3d at p. 1387.) Moreover, a "statute should be construed whenever possible so as to preserve its constitutionality." (*Ibid.*)

### a. Language of Subdivision (h)(5)(C)

Subdivision (h)(5)(C) reads: "Only in cases where the petition involves an offense listed in subdivision (b) of Section 707 may the court consider whether it is necessary and in the best interests of the minor and the public's safety to order secure confinement of a minor for *up to an additional year, not to exceed 18 months* from the finding of incompetence." (Italics added.)[8]

The plain meaning of subdivision (h)(5)(C) is that the court can confine 707(b) juveniles up to 18 months from the initial finding of incompetence, upon a finding that such confinement is necessary and in the best interests of the minor and public safety. The subdivision is silent, however, as to the purposes for any confinement after the 12-month remediation period. Specifically, the subdivision does not state whether necessity and the "best interests of the minor and the public's safety" can justify continued confinement solely to arrange post-release services, or whether the confinement must be premised on a prospect of remediation.

By the terms of subdivision (h)(5), the "best interests of the minor and public's safety" must be evaluated in light of certain factors: where the minor will have the best chance of obtaining competence, whether the placement is

---

[8]     The phrase, "up to an additional year," means a year in addition to the initial six months referenced in subdivision (h)(1). Arguably, the court can order this extra year of confinement at the six-month hearing, as opposed to ordering an additional six months confinement at the six-month hearing and ordering the balance at a subsequent 12-month hearing. The parties do not raise this issue, and we need not address it to resolve the appeal.

18

the least restrictive for the minor, why alternatives to secure confinement are not available or appropriate, and whether the placement is necessary for the safety of the minor or others. (§ 709, subd. (h)(5)(A).) These factors acknowledge a concern with personal and public safety, but they also suggest a tethering of extended confinement with *remediation*, as well as a sensitivity to placing the minor in the least restrictive appropriate environment. The factors do not state whether the best interests of the minor and public safety can justify confinement of the minor solely to arrange post-release services.[9]

Other provisions of subdivision (h) do not answer the question either. Subdivision (h)(4) allows the court, upon finding at the six month hearing that a juvenile will not be remediated within six more months, to "*invite* persons and agencies with information about the minor . . . to the dismissal hearing *to discuss* any services that may be available to the minor after jurisdiction is terminated." (Italics added.) It also allows the court to "*refer* the minor for evaluation" pursuant to section 5300 et seq. [e.g., confinement for treatment for up to 180 days for certain persons who threatened, attempted, or inflicted substantial physical harm] and section 6550 et seq. [where juvenile court finds minor is described by section 300, 601, or 602 and is in doubt concerning the person's mental health]. (Italics added) But neither subdivision (h)(4) nor any other provision states that the court can *confine* the juvenile after the *12*-month remediation period, under the authority of subdivision (h)(5)(C), merely because the court awaits the finalization of post-release services. To the contrary, such an interpretation

---

9    We note that the parties debated the level of J.J.'s dangerousness at the juvenile court hearing. The People pointed primarily to the nature of his alleged offenses. J.J. pointed to his generally good behavior at juvenile hall, urging there was no documented indication of violence or sexually inappropriate behavior. He had no prior criminal history.

would be at odds with the overall statutory purpose—as discussed next—which reflects an intent to confine juveniles only to restore competency.

### b. *Statutory Purposes and Language as a Whole*

Taking the statutory language as a whole, section 709 reveals two overarching purposes. First, the statute protects a minor from juvenile proceedings while the minor is incompetent within the meaning of the statute—essentially, unable to contribute meaningful to his or her defense. (§ 709, subd. (a)–(c), (e)–(f), (h)(4).) Second, during a period no longer than reasonably necessary to decide whether this competency will be attained, the statute provides services to the minor to help restore competency so that the juvenile proceedings can recommence. (§ 709, subd. (d), (e), (g)(1), (h)(2)–(3); see *People v. Waterman* (1986) 42 Cal.3d 565, 570 ["The goal of treatment for incompetence . . . is to restore the mental ability to stand trial."].)

The latter purpose—remediation in the hope of restoration to competency—is pursued through the provision of therapy, treatment, and other remediation services, delivered to the minor while the minor is either confined or not. (§ 709, subd. (g)(1).) These remediation services, the statute warns, should be "provided in the least restrictive environment consistent with public safety." (§ 709, subd. (g)(1); see also § 709, subd. (h)(5)(A)(ii) ["least restrictive setting appropriate for the minor"].) "A finding of incompetency alone shall not be the basis for secure confinement," and the court must "consider appropriate alternatives to juvenile hall confinement," including several set forth in the statute. (§ 709, subd. (g)(1).) If the minor moves from in-custody status to out-of-custody status, the county must provide alternatives for the continued delivery of remediation services.

(§ 709, subd. (g)(1).) Thus, subdivision (g) anticipates the possibility of remediation without secure confinement, but it does not contemplate confinement without remediation.

To be sure, section 709 mentions the "public's safety," but not to justify confinement without remediation. While subdivision (g)(1) specifies that "[s]ervices shall be provided in the least restrictive environment consistent with public safety," that statement is made in describing the court's referral of the minor to services "designed to help the minor attain competency" and "services to assist in remediation." Subdivision (h)(5) refers to extending confinement to 18 months upon a finding that it is "necessary and in the best interests of the minor and the public's safety," but that determination is based not solely on protecting the public, but also on whether it will give the minor the "best chance of obtaining competence" and whether less restrictive alternatives have been ruled out (factors which the court here did not explicitly evaluate). In short, section 709 aims to accommodate public safety in determining the location of remediation services, but it does not purport to justify confinement solely for the purpose of protecting the public without remediation services for restoration of competency.

*c. Constitutional Considerations*

In interpreting subdivision (h)(5)(C), we must not only consider the words of the subdivision and the language of the statute as a whole, but also arrive at a construction that avoids serious constitutional doubts. (*Dyna-Med., Inc.*, *supra*, 43 Cal.3d at p. 1387.) The parties agree that continuing a juvenile's confinement under section 709 without remediation services would, at a minimum, raise substantial due process questions.

In *Jackson v. Indiana* (1972) 406 U.S. 715 (*Jackson*), the United States Supreme Court ruled: "[A] person charged by a State with a criminal offense

21

who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.  If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." (*Id*. at p. 738.)  "At the least, due process requires that the *nature* and duration of commitment bear some *reasonable relation to the purpose for which the individual is committed*."  (*Ibid*., italics added.)  "[E]ven if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." (*Ibid*.)

Our Supreme Court followed *Jackson* in *In re Davis* (1973) 8 Cal.3d 798, adopting the "rule of the *Jackson* case that no person charged with a criminal offense and committed to a state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future, and that unless such a showing of probable recovery is made within such period, he must either be released or recommitted under alternative commitment procedures."  (*Id*. at p. 801.)  Because the protections of *Jackson* and *Davis* reflect essentials of due process, they apply to the detention of minors found incompetent to stand trial.  (*In re Albert C*. (2017) 3 Cal.5th 483, 490.)

Continuing the involuntary confinement of a juvenile under section 709, after it was determined that the juvenile had not regained competency during the statutory remediation period, and without a finding that he would be remediated during an extended confinement, could arguably constitute

22

holding the juvenile beyond the "reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." (*Jackson, supra,* 406 U.S. at p. 738; see *id*. at pp. 725–726; *Davis, supra*, 8 Cal.3d at p. 806 ["if petitioners are making no reasonable progress toward that goal [restoring competency], they must be released or held subject to alternative commitment procedures"].) And keeping the juvenile confined solely for the purpose of arranging post-release services is plainly contrary to the premise that commitment "must be justified by progress toward [the] goal" of restoration to competency. (*Id*. at p. 804.)

We must remember, of course, that a minor in J.J.'s position has not been found guilty of any crime, the allegations against him have not been substantiated, and, although deemed to be incompetent to stand trial, the juvenile has not necessarily been found, after relevant mental health examination, to be a danger to himself or others. (See *Jackson, supra,* 406 U.S. at pp. 737–738.) There is no basis for his confinement under section 709 except as a byproduct of efforts to restore his ability to aid in his defense against the charges; without services to restore this competency, the legal justification for his confinement under section 709 evaporates.

Because continued confinement of a juvenile beyond the remediation period for a purpose other than restoration to competency would potentially violate the juvenile's due process rights, subdivision (h)(5)(C) cannot be found to authorize such confinement.[10]

---

[10]    J.J. also contends a juvenile's confinement under section 709 without remediation services violates the Fourteenth Amendment right to equal protection and the Eighth Amendment right against cruel and unusual punishment. (Citing *Jackson, supra*, 406 U.S. at p. 730 [subjecting individuals to a more lenient commitment standard and more stringent

23

### d. *Legislative History*

The first version of section 709, effective January 1, 2011, embraced the constitutional mandate set forth in *In re Davis*: "If the minor is found to be incompetent by a preponderance of the evidence, all proceedings shall remain suspended for a period of time that is no longer than reasonably necessary to determine whether there is a substantial probability that the minor will attain competency in the foreseeable future, or the court no longer retains jurisdiction." (Former § 709, subd. (c).) The statute did not specify a duration for remediation services or secure confinement, or state how long is "reasonably necessary" to decide where there was a substantial probability of competency. (*Ibid.*; see *In re Albert C., supra,* 3 Cal.5th at p. 491.)

To address the concern that section 709 might be used to retain minors too long in remediation, the statute was amended by Assembly Bill No. 1214 (2017–2018 Reg. Sess.), effective January 1, 2019 (AB 1214). AB 1214 provided the version of the statute we have today, except for technical amendments irrelevant to the petition before us. (Stats. 2019, ch. 161, § 1.)

The author of AB 1214, California Assembly member Mark Stone, summarized the need for the legislation as follows: "AB 1214 would *establish timelines and processes relating to the determination of competency in court proceedings and the evaluation and delivery of remediation services.* While existing law establishes juvenile competency and sets forth guidelines for these proceedings, there remain some operational ambiguities among practitioners relative to the types of remediation services to be delivered, who

---

release standard than those applied to persons not charged with offenses violated equal protection]; *Robinson v. California* (1962) 370 U.S. 660, 665–667 [involuntarily confining an individual due to mental illness constitutes cruel and unusual punishment unless accompanied by adequate treatment].)

24

is the appropriate entity to deliver them, and where a youth will receive those services and for how long.  This bill seeks to provide additional guidance around these questions.  [¶]  The practical impact is that there are times in which juveniles are remaining in the hall without *clear timelines governing the length of remediation services.*  It is important that not only do these vulnerable kids receive appropriate services, but that they do so within a reasonable time frame in order to get them *out of the hall* and in proper placement and care going forward."  (Sen. Com. on Pub. Saf., Analysis of Assem. Bill No. 1214 (2017–2018 Reg. Sess.) June 20, 2018, p. 7, italics added.)

Put simply, the intent behind section 709 as it stands today, including the 12-month remediation period added in subdivision (h)(3), was to set a deadline by which remediation services would be completed so that juveniles would not languish in "the [juvenile] hall."  (Sen. Com. on Pub. Saf., Analysis of Assem. Bill No. 1214, *supra*, at p. 7.)

At the same time, it was recognized that section 709 would allow confinement of 707(b) juveniles for up to 18 months, at least in part to protect public safety.  In support of AB 1214, the Chief Probation Officers of California (CPOC) in June 2018 noted:  "Although the prior legislation represented a giant step forward, clear timelines and processes are necessary to balance public safety with the treatment needs of the accused [¶] . . . [¶] AB 1214 sets forth a [six] month minimum time in custody and one year for the provision of remediation services."  (Sen. Com. on Pub. Saf., Analysis of Assem. Bill No. 1214, *supra*, at p. 9.)  CPOC also observed that "[r]esearch on remediation services suggests majority of youth can be remediated prior [to] a year if they are able to be remediated."  (*Ibid*.)  "Although very rare, the bill does recognize there may be circumstances which necessitate a custodial

setting and addresses this issue by allowing a petition to the court for a *civil commitment* pursuant to WIC 5300 et seq., or WIC 6550 et seq. . . .  Further, in cases involving 707b petitions, *a youth may remain in the hall up to 18 months upon the finding of incompetency.* . . We believe these provisions strike the balance between the safety of the youth and community and ensures the youth do not remain in a custodial setting longer than they would if they had been adjudicated. . . .  [I]t is imperative we look to alternatives to custody where appropriate and are providing remediation services in the most suitable, least restrictive setting for the safety of the youth and the community . . . ." (Sen. Com. on Pub. Saf., Analysis of Assem. Bill No. 1214, *supra*, at p. 9., italics added.)[11]

The legislative history, therefore, confirms a desire to limit the duration of remediation efforts so juveniles do not languish in confinement. Like the language of the statute, it further discloses a willingness to confine 707(b) juveniles for up to 18 months for the best interests of the minor and

---

[11] An earlier effort to amend section 709, Assembly Bill No. 935 (2017–2018 Reg. Sess.), had provided for a maximum of 12 months of remediation services and six months of secure confinement for all minors, but as to 707(b) juveniles allowed the court to "consider whether it is necessary and in the best interest of the minor and the public's safety to order secure confinement of a minor for up to an *additional six months, not to exceed one year.*" (Assem. Bill No. 935 (2017–2018 Reg. Sess., § 1 [proposed § 709, subd. (h)(5)(A)]; italics added.)  In other words, the bill proposed a maximum of 12 months confinement for 707(b) juveniles, *matching* the 12-month remediation period.  Governor Jerry Brown vetoed AB 935 in October 2017, however, expressing concern "with the rare instances in which youth are accused of very serious crimes" and "encourag[ing] further review as to how these situations may be accounted for while preserving the author's underlying intent."  (Governor's Veto Message, Assem. Bill No. 935 (Oct. 19, 2017).)  The Governor's veto message was quoted by the Senate Committee on Public Safety without elaboration in its analysis of AB 1214. (Sen. Com. on Pub. Saf., Analysis of Assem. Bill No. 1214, *supra*, at p. 8.)

public safety, but there is no legislative statement that a juvenile court could do what the court did here—continue confinement after the juvenile remained incompetent at the 12-month mark, solely for the purpose of arranging post-release services.

### e. Conclusion

Based on the statutory language, statutory purposes, constitutional case law, and legislative history, there is no indication that section 709 can be used to confine a juvenile involuntarily, after he is determined to be incompetent at the end of the 12-month remediation period, solely for the purpose of delaying his release until post-release services (to which he objected) have been arranged and approved. In this case, none of the post-release services were purported to be for restoration of competency or even ancillary to that purpose. The February 9, 2021 order was erroneous.

We realize the importance of protecting public safety and the laudatory aim of assisting the juvenile in his or her return to the community, and we recognize the juvenile court's concerns in this regard. But we question the idea that an additional six months of confinement is needed to devise post-release services in order to protect the minor and the public. While the district attorney and others may need time to arrange for post-release services, in most instances the parties will suspect any need for such services long before the 12-month hearing, given psychiatric competency reports and monthly reviews of remediation services. And by all indications, post-release services would be voluntary, leaving the efficacy of those services largely up to the juvenile.

At any rate, a perceived need to shield the public from the juvenile and to put in place post-release services is not sufficient in itself to justify involuntary confinement of the juvenile under *section 709*. Other statutory

27

mechanisms are available and a far better fit. (E.g., § 5300 [180-day confinement for further treatment of imminently dangerous persons, after 14-day certification]; § 6500 et seq. [commitment of person with developmental disability who has been found incompetent to stand trial and dangerous to others], § 6550 et seq. [applicable where minor has been found to be described by sections 300, 601, or 602].) In fact, the issues we decide here would have been obviated if the People had pursued a civil commitment of J.J. under section 6500 earlier, such that his confinement after the remediation period would have been pursuant to that statute rather than subdivision (h)(5)(C).

Accordingly, we hold that a juvenile cannot be confined under subdivision (h)(5)(C) beyond the statutory remediation period, where the juvenile has not attained competence by the end of that remediation period, there is no finding that he would attain competence in the foreseeable future, and confinement is prolonged solely to find post-release services rather than to restore the juvenile to competency.[12]

---

[12] We need not consider further what the Legislature had in mind by allowing up to 18 months of confinement for 707(b) juveniles. Accordingly, we do not decide whether confinement of a 707(b) juvenile beyond the 12-month statutory remediation period under subdivision (h)(5)(C) would be unconstitutional; whether (as the People urge) any constitutional infirmity could be cured by the continued provision of remediation services and an implied extension of the 12-month remediation period; whether (as J.J. urges) continued confinement would be permissible only to finish adjudication of competency; or whether confinement might continue pending completion of remediation services where, for example, the remediation period had been tolled or where the juvenile is found likely to regain competence during the extended period. Subject to constitutional constraints, including that confinement cannot exceed a period reasonably necessary to determine whether the minor can attain competency in the foreseeable future, the Legislature may allow the courts to continue confinement upon specified findings as it pursues the goal of restoring the minor to competence.

28

## III. DISPOSITION

The juvenile court erred in its February 9, 2021 order. Because the petition's request for relief has become moot, however, the petition is denied.

 

_____

NEEDHAM, J.

We concur.

_____

SIMONS, Acting P. J.

_____

BURNS, J.

*J.J. v. Superior Court* / A162060

A162060 / J.J. v. Superior Court

Trial Court:  Superior Court of Contra Costa

Trial Judge:  Honorable Anita L. Santos

Counsel:   Joni Spears, Deputy Public Defender, Robin Lipetzky, Public Defender, and Brigitte Nicoletti, Post-Bar Fellow, for Petitioner.

No appearance for respondent.

Xavier Becerra, Attorney General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Seth K. Schalit, Supervising Deputy Attorney General, and Bridget Billeter, Deputy Attorney General.